IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| MARIBEL BETANCOURT VAZQUEZ, | § | |
| --- | --- | --- |
| | § | |
| Petitioner, | § | |
| | § | Civil Action No. 3:10-CV-2519-BF |
| v. | § | |
| | § | |
| RAFAEL MORIN ESTRADA, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before the United States Magistrate Judge. Before the Court for consideration is Petitioner Maribel Betancourt Vazquez's Petition for Return of Child, brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980, implemented by the International Child Abduction Remedies Act ("ICARA"). The Court conducted a bench trial on January 14, 2011. The Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a):

## I. BACKGROUND

The Petitioner, Maribel Betancourt Vazquez ("Petitioner"), and the Respondent, Rafael Morin Estrada ("Respondent"), are the parents of eight-year-old Leia Morin. Petitioner and Respondent are both from Monterrey, Mexico, where they began their relationship. They were never married. The relationship lasted until 2007, during which time they had two daughters, Leia and Isabella.

From 2001 to 2007, Petitioner and Respondent lived together in Dallas, Texas with Leia and Isabella. On July 2, 2007, Petitioner was deported at the border when traveling from Monterrey to Dallas. Respondent decided to remain in Dallas. Immediately after Petitioner was deported, her

mother traveled to Dallas on a tourist visa and picked up Leia and Isabella. Respondent raised no objections and voluntarily sent the children with their grandmother to live in Mexico with Petitioner. Petitioner and Respondent agreed that the two daughters would live with their mother in Monterrey and visit their father during the summer and winter breaks from school. They operated under this agreement beginning in the fall of 2007 through the summer of 2010.

In July 2010, Leia went to Dallas to visit her father for the summer break, as per the agreement. In August 2010, Petitioner called Respondent to inform him that it was time for Leia to return to Monterrey to start second grade. Respondent refused to return Leia to Monterrey. Thereafter, Petitioner filed an application for the return of Leia with the Mexican Central Authority.

## II. LEGAL ANALYSIS

The Convention is an international treaty adopted to address the harm done to children by international parental kidnaping and is designed to restore the factual status quo and protect the legal rights of the non-abducting parent. The stated objectives of the Convention are to "secure the prompt return of children wrongfully removed or retained in any Contracting State" and to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention, Article 1. ICARA is the implementing legislation. 42 U.S.C. § 11601(b). A court considering a petition for the return of a child under the Convention and ICARA has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute. Hague Convention, Article 19; 42 U.S.C. § 1601(b)(4); *Sealed Appellant v. Sealed Appellant*, 394 F.3d 338, 344 (5th Cir. 2004); *Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996) (hereinafter *Friedrich II*).

The Convention mandates the return of children under the age of 16 to their circumstances

prior to the abduction if one parent's removal or retention violated the custody rights of the other parent and was therefore "wrongful." Hague Convention, Article 12; 42 U.S.C. § 11601(a)(4). The removal or retention of a child is wrongful when: (1) it is in breach of rights of custody attributed to a person, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (2) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. Hague Convention, Article 3. To establish the elements of wrongful removal or retention, a petitioner must prove by a preponderance of the evidence that: (1) the habitual residence of the child immediately before the date of the removal or retention was in the country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (3) the petitioner was actually exercising or would have been exercising those custody rights at the time of the child's removal or retention. *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001). If petitioner meets this burden, the court must promptly return the child to the country of her habitual residence. *Sealed Appellant*, 394 F.3d at 342-43 (citing 42 U.S.C. § 11601(a)(4)).

The Convention provides several narrow affirmative defenses to wrongful removal. *See* Hague Convention, Articles 12, 13, 20. A court is not required to order the return of the child if: (1) the petitioner was not actually exercising custody rights at the time of removal or retention (Article 13a); (2) the petitioner consented to or subsequently acquiesced in the removal or retention (Article 13a); (3) the petition for return was filed more than one year after the date of the removal or retention and the child is now settled in her new environment (Article 12); (4) there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place

3

the child in an intolerable situation" (Article 13b); or (5) return of the child would violate fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms (Article 20). The respondent must prove the first three defenses by a preponderance of the evidence; the last two must be established by clear and convincing evidence. 42 U.S.C. § 11603(e)(2). The Court may also refuse to return the child if "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its view." Hague Convention, Article 13. However, even if the respondent can establish a defense, the court retains the discretion to order the return of the child. *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000) (citing *Friedrich II*, 78 F.3d at 1067).

## A. Wrongful Removal

### 1. Habitual Residence

Neither the Convention nor ICARA define "habitual residence." Instead, it is a concept intended to be applied to the facts and circumstances of each case. *Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir. 1995). Federal courts are split as to what role the intentions of the parents should play when determining a child's habitual residence. The Sixth Circuit has held that the court must focus on the child, not the parents, and examine past experience, not future intentions. *See Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) (hereinafter *Friedrich I*). Under this approach, future intentions of the parents are irrelevant. *See id.* The Ninth Circuit, on the other hand, holds that there must be a settled intention to abandon an existing habitual residence before a child can acquire a new one. *Mozes v. Mozes*, 293 F.3d 1067, 1075 (9th Cir. 2001). This approach centers its focus on the intentions of the person or persons entitled to fix the child's place of residence. *See id.* at 1076. Both the Seventh and Second Circuits have adopted this approach. *See Koch v. Koch*, 450 F.3d 703,

4

713-14 (7th Cir. 2006); *Gitter v. Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005). Finally, the Third and Eight Circuits have espoused a child-centered approach that takes into account the parents' intentions. *See Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir.); *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). These circuits have held that a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which as a "degree of settled purpose" from the child's perspective; however, the court should also take into account the present, shared intentions of the parents. *See Silverman*, 63 F.3d at 898; *Feder*,63 F.3d at 224.

Under each approach, the Court finds that the child's habitual residence was Mexico at the time Respondent retained the child in August of 2010. For three years, Leia lived in Mexico with her mother and visited her father during the summer and Christmas break, pursuant to the Petitioner and Respondent's agreement. Respondent does not dispute that this was the their agreement. Leia attended school in Monterrey. She has many family members there, including her younger sister, and four pet dogs. Her primary language is Spanish. Although Leia had spent a month each summer and two weeks each winter with her father in Texas, she always returned to Mexico to live with her mother and sister and to attend school. Moreover, the parents' intentions had not changed when Leia was sent to Dallas in July 2010. Nor did their intentions change during Leia's stay. At all times, they intended Leia to return to Mexico for the school year. The evidence clearly shows that Leia's habitual residence at the time of her retention was Mexico.

*2. Violation of Custody Rights*

Petitioner also has the burden of proving that the retention of the child was in breach of her custody rights under Mexican law. *Sealed Appellant*, 394 F.3d at 343. Petitioner and Respondent

were never married and never executed a formal custody agreement. Leia's habitual residence in Monterrey, Mexico is in the State of Nuevo Leon. Article 414 of the Nuevo Leon Civil Code states that "[p]arental authority/responsibility is exerted jointly by both parents." Civil Code for the State of Nuevo Leon, Article 414. It further states that "[w]hen the parents of a child born out of wedlock that were living together, separate, they will both retain parental authority/responsibility" over the child. Civil Code for the State of Nuevo Leon, Article 417. Therefore, Petitioner shares a joint right of parental authority over Leia with Respondent, and Respondent's retention of Leia outside her habitual residence interferes with Petitioner's rights of custody. *See Sealed Appellant*, 394 F.3d at 343.

### *3. Exercise of Custody Rights*

Finally, Petitioner must establish that she was actually exercising her custody rights at the time the child was wrongfully retained. To avoid the improper consideration of an underlying custody dispute, courts have interpreted "exercise" broadly. *Sealed Appellant*, 394 F.3d at 344; *see also Friedrich II*, 78 F.3d at 1063. "In the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights." *Sealed Appellant*, 394 F.3d at 345. In order to show a failure to exercise custody rights, the party opposing the return of the child must show that the other parent has abandoned the child. *Id.*; *see also Friedrich II*, 78 F.3d at 1066.

Before Leia left for Dallas in July 2010, Petitioner made the decisions about which school Leia would attend, where she would live, and all medical decisions relating to Leia. She provided Leia with financial support, meals, clothes, and made all other decisions regarding the care of Leia. Furthermore, she continued to make phone calls throughout the summer to check in on Leia, and she

6

continued that contact after Leia was retained in August 2010. Petitioner was clearly exercising her custody rights at the time Respondent retained Leia in August 2010.

## **B. Affirmative Defenses**

Respondent asserts two of the available affirmative defenses. First, he contends that Petitioner consented or acquiesced in the retention of Leia. Second, he argues that Leia's return to Mexico would expose her to a grave risk of physical harm and place her in an intolerable situation.

*1. Consent or Acquiescence*

Respondent admits that when Leia came to visit in July 2010, the visit was according to their original agreement and that she was to return to Mexico for the school year. However, he argues that while Leia was with him, she decided she did not want to return to Mexico. He says she asked her mother if she could stay in Dallas. Respondent contends that although she initially refused, Petitioner eventually agreed that Leia could stay in Dallas, live with her father, and go to school there.

To support this contention, Respondent argues that although Petitioner sent several emails to Respondent after August 2010, none of the emails demanded the return of Leia to Mexico. He claims that prior to Petitioner's deportation in 2007, he and Petitioner intended for the children to attend school in Dallas. He also contends that Petitioner never called him to demand the return of Leia. He argues that only after he informed Petitioner that he would no longer provide her with any financial support did she decide to file a petition seeking the return of Leia.

The Court finds Respondent's evidence to be unconvincing and probative of very little. The emails written by Petitioner, although sent to Respondent's email address, were directed to Leia personally. Petitioner sent those emails for the purpose of communicating with her daughter, not to

7

discuss the current custody situation. Furthermore, even if, prior to 2007, Petitioner and Respondent intended to send their children to school in Dallas, this fact is irrelevant. They did not know at the time that Petitioner would be deported to Mexico. After being deported, their plans changed. Leia and Isabella moved to Mexico, and Leia attended school there. Respondent has admitted that they agreed for the children to live with their mother in Mexico, and they operated under that agreement for three years. Respondent was aware Leia attended school in Mexico and raised no objections. Additionally, Respondent provided Petitioner with merely one hundred dollars per month over the past three years. Petitioner testified that she did not rely on money from Respondent to provide for Leia and Isabella. Therefore, Respondent's argument that Petitioner filed her petition only after she learned Respondent would no longer send her money holds little water. Finally, Petitioner filed a letter with the Mexican Central Authority on September 3, 2010, almost immediately after Leia was retained in Dallas. This is strong evidence that Petitioner had not in fact consented to the retention of her child. The Court is unable to find by a preponderance of the evidence that Petitioner acquiesced to the retention of Leia at any time.

### 2. Grave Risk

Respondent argues that Leia's return to Mexico would expose her to a grave risk of physical harm due to the "spiraling violence and surge in murders in Monterrey" and because of "specific violent acts that have been committed in the school Leia attended in Monterrey and in the neighborhood where Petitioner resides." (Resp. Ans. ¶ 23.) Respondent must prove that a grave risk exists by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

Like the other defenses, the grave risk defense must be narrowly construed. *See England*, 234 F.3d at 270-71; *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000); *Nunez-Escudero v. Tice-Menley*,

58 F.3d 374, 376 (8th Cir. 1995). The defense was not intended to encompass situations such as the return to a home where money is in short supply or where educational opportunities are more limited. 51 Fed.Reg. 10494, 10510, 1986 WL 133056 (1986); *see also Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010). Instead, a grave risk or intolerable situation exists where return of the child would send the child to a "zone of war, famine, or disease," or in cases of serious abuse or neglect. *Silverman*, 338 F.3d at 900 (citing *Friedrich II*, 78 F.3d at 1069).

Respondent provided evidence that there has been a surge of violent activity in Monterrey due to drug cartel activity and that the neighborhood where Petitioner lives is dangerous. This is not sufficient to find that Monterrey is a "zone of war." *See Silverman*, 338 F.3d at 900-01 (finding that general regional violence in Israel does not establish a "zone of war"); *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1365-66 (finding civil instability and presence of violent demonstrations in Argentina did not amount to a "grave risk" or "intolerable situation"). Respondent has failed to establish by clear and convincing evidence that a grave risk of physical harm exists.

## CONCLUSION

The Court finds that Respondent wrongfully retained Leia in violation of Petitioner's custody rights under Mexican law. Therefore, the Court hereby GRANTS the Petition for Return of Child and ORDERS the return of the child to Mexico.

SO ORDERED, January 19, 2011.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

9